RICE and another vs. CUTLER and another, impleaded &c.

A warehouse receipt which recites that the property therein mentioned is " deliverable to the bearer," may be transferred by the owner without indorsement so as to pass the title to the property, if the transfer be made with that intent.

Section 6, ch. 340, Laws of 1860, which provides that warehouse receipts may be transferred by indorsement, and what effect they shall have when so transferred, does not operate to prevent in all cases a passing of the title by a transfer of

the receipt without indorsement. The language is permissive only, and not imperative; and the right existed independently of the statute.

The object of the statute is not to prevent the owner of the property from passing the title in any manner previously effectual for that purpose, but to protect those dealing with persons who are entrusted with such evidences of title only as factors or agents.

There is nothing in the fact that such receipts are taken in discharge of a prior indebtedness, which deprives the transferee of the protection to which he would otherwise be entitled as an innocent purchaser without notice that his vendor acquired title by fraud.

Matters of controversy between co-defendants, the settlement of which is not essential to the determination of the plaintiff's case, cannot be adjusted by the judgment, unless the claim was made by the one defendant, and an opportunity given the other to deny it.

APPEAL from the County Court of *Milwaukee* County.

This appeal was taken by *Cutler* and *Conkey*, two of the defendants, from a judgment in this action, rendered against them in favor of their co-defendant *Higby*. The questions at issue between the parties will sufficiently appear from the opinion of the court.

*Henry F. Prentiss*, for appellants, as to the rule on the subject of rendering judgment between co-defendants, cited 2 Whit. Pr. (3d Ed.), 535–6; *Norbury vs. Seeley*, 4 How. Pr. R., 73; *Woodworth vs. Bellows*, id., 24; *Wells vs. Smith*, 7 Abbott, 261, 265. 2. Counsel contended that the purchase of the receipts by *Comstock* was not fraudulent. 3. If it was, the appellants are protected as *bona fide* purchasers. (1.) The nonindorsement of the receipts does not deprive them of that character. The testimony shows that the universal custom among produce merchants in Milwaukee had been for years to buy and sell such receipts without indorsement. (2.) The fact that the appellants took the receipts in payment of an antecedent indebtedness from *Comstock*, does not affect their rights as *bona fide* purchasers. *Stevens vs. Campbell*, 13 Wis., 377; *Jenkins vs. Schaub*, 14 id., 1.

*E. Mariner*, for respondent *Higby*, contended, 1. That upon the evidence, the purchase by *Comstock* was properly held to be fraudulent. 2. That *Conkey* and *Cutler* were innocent pur-

chasers for a valuable consideration paid. They were *Comstock's* agents to sell the receipts, with the right to appropriate the proceeds to their own use, *crediting him therefor in account. Campbell vs. Stevens*, 13 Wis., 375; *Coddington vs. Bay*, 20 Johns., 637; *Stalker vs. McDonald*, 6 Hill, 93. Again, the property in the receipts and grain could not be passed absolutely, discharged from the equity of the plaintiffs, without an indorsement. Laws of 1860, chap. 340. The plain intent of the act is to prevent false practices in the business · of warehousing and dealing in warehouse receipts; to protect the community from frauds therein by pains and penalties. It was intended to cover all dealings except in the case of receipts which, by their terms, are not negotiable. It created a new law. It gave to warehouse receipts the same freedom of negotiability, discharged from equities, that negotiable paper has, and at the same time it preserved the contract of bailment in its original force, and enforced it by penalties. Although there are no negative words, the statute is imperative. Smith on Stat. Con., 666-7, and cases cited. 3. Counsel contended that a judgment may be rendered in favor of one defendant against another, citing R. S., ch. 132, secs. 25, 26, and *Wells vs. Smith*, 7 Abbott, 261; and that the pleadings herein were sufficient to sustain such a judgment. Under secs. 37 and 40, ch. 125, and sec. 29, ch. 132, R. S., it is sufficient if an answer was filed by either the appellants or respondent. Here answers were filed by both. A prayer for relief by the respondent was not necessary. 13 Wis., 256.

*By the Court*, PAINE, J. The plaintiffs in this case sold to the defendant *Comstock* a quantity of wheat, which they owned in the warehouse of the defendant *Higby*, and for which they held two warehouse receipts, each reciting that the wheat was "deliverable to bearer" on return of the receipt. They delivered the receipts to *Comstock* without indorsement. They aver that he made the purchase fraudulently, knowing that he

was in an insolvent condition, without intending to pay, and knowing that the check which he gave as cash in payment would be dishonored for want of funds.

They also aver that he had delivered the receipts to the defendants *Conkey* and *Cutler* upon some agreement, but that they were not *bona fide* purchasers for value, and the object of this suit was to have the purchase by *Comstock* adjudged fraudulent, that *Conkey* and *Cutler* might be restrained from transferring the receipts, and be adjudged to surrender them to the plaintiffs, and that *Higby* might be restrained from delivering the wheat to any of the other defendants.

The defendants *Conkey* and *Cutler* answered denying all knowledge of the fraud, and averring that they had purchased the receipts of *Comstock* in the usual course of business, to be applied in payment of a previous indebtedness, and had on the same day resold them to the defendant *Higby*, who, as it appeared, had destroyed them. The defendant *Higby* filed no answer until after the trial and decision of the case by the judge.

The judge found the purchase by *Comstock* fraudulent, and that neither *Conkey* and *Cutler* nor *Higby* were *bona fide* purchasers without notice; and he gave the plaintiffs judgment against *Higby* for the value of the wheat, gave *Higby* a judgment against *Conkey* and *Cutler* for the same, with interest from the date of his purchase, and *Conkey* and *Cutler* a judgment against *Comstock* for the same, with interest from the date of their purchase.

It seems *Higby* afterwards filed an answer, and, as he has not appealed, it is unnecessary to determine whether the practice, as against him, was regular or not.

But the defendants *Conkey* and *Cutler* object that the court had no authority to render a judgment in favor of *Higby* against them, when *Higby* had not asked for such a judgment, and they had had no opportunity to contest his right to it. And as a matter of practice this objection seems to be well

founded. Whatever matters may be adjusted as between co-defendants, when the claim is made, and an opportunity given to contest it, it seems clear that matters of controversy between them, the settlement of which is not essential to the determination of the plaintiffs' case, cannot be adjusted by the judgment, unless the claim was made by the one defendant, and an opportunity given to the other to deny it. It is obvious in this case that even though *Higby* had a cause of action against *Conkey* and *Cutler*, by reason of the failure of their title to the wheat, still they may have had a set off for the whole amount, which they would have been entitled to show, if they had been apprised that *Higby* sought to recover against them in this suit. The authorities cited by the appellant show that such a practice cannot prevail ; and it is clear that, whether it has done so or not in this case, it might lead to great confusion and injustice if generally adopted. We have thought proper to decide this question of practice, although from our conclusions upon the merits of the case, we are obliged to reverse the judgment upon other grounds. The court below found that the defendants *Conkey* and *Cutler* "were not innocent purchasers, without notice, for a valuable consideration paid." So far as this finding was based upon the fact that the consideration paid by them was the discharge of a prior indebtedness, it is disposed of by the decision of this court in the case of *Shufeldt vs. Pease and another*, 16 Wis., 659. But it was also based, as stated in the argument, upon the fact that the receipts were not indorsed at any of the transfers. And it is claimed that, by virtue of the provisions of chapter 340, Laws of 1860, and particularly of section 6, which provides that warehouse receipts may be transferred by indorsement, and what effect they shall have when so transferred, no purchaser can be considered a purchaser without notice, unless the receipt is transferred to him by indorsement. It is said that this statute was designed to prevent fraudulent practices in respect to such receipts, and that its provisions should be held imperative. There is no

doubt such was its design, and a large number of its provisions are penal in their character, and well adapted to secure that end. But we have been unable to discover that the provision in section 6, that the receipts may be transferred by indorsement, was designed to prohibit a transfer in any other mode. The fraudulent practices which the statute aimed to prevent, consisted in the issuing of warehouse receipts, bills of lading and other similar instruments, without actually having the property, and also the improper delivery of such property where receipts had once been rightfully issued for it. The provisions of this statute punishing such acts, are as effective to prevent them as any statute can be. And it is difficult to see how a requirement that the property should never be conveyed except by an indorsement of the receipt, could aid in accomplishing that end.

The language is permissive merely, and not prohibitory. 'Still, if the statute were the only source of right to transfer the property represented by such a receipt, the maxim *expressio unius exclusio est alterius* might be applicable, and the result would be that it could be transferred only by indorsement of the receipt, since the statute mentioned only that. But if other modes of transfer existed, there is nothing in the language of this act, nor in its spirit and object, that would prohibit a transfer according to such other modes, with the same effect that it would have if this statute had not been passed.

And independently of this statute there can be no doubt that the mode of transfer adopted by these parties would have been amply sufficient to pass the title to the wheat. It is well settled that the title to property not capable of convenient actual delivery will pass by the delivery to the vendee of the usual documentary evidences of title, with the intent to transfer it. Of the intent in this case there is no doubt. The whole evidence shows that it was intended and considered by all the parties as a complete transfer of title to the wheat. The custom existing in Milwaukee to transfer such receipts without

indorsement, might be looked to, to show what the intent was, if it were not otherwise clear; though of course such a custom could have no effect to set aside the statute, if the latter were designed to prohibit such a mode of transfer.

It is true that in most of the books and cases that speak of the transfer of property by a delivery of the bills of lading, those instruments are said also to have been indorsed. But bills of lading, according to their usual form, promise to deliver the property to the consignees or their assigns, so that an indorsement or other assignment would be necessary in order to bring any other holder within the terms of the contract. But where a warehouse receipt promises directly to deliver the property to the bearer, as these do, I have found no case that indicates that an indorsement would have been essential to pass the title to the property covered by such receipt, where the owner sold it and delivered the receipt with the intent to thereby transfer it. On the contrary, there are several cases that imply that it would not, and some of them, even, cases where it did not appear that the receipts ran " to bearer," as these do. *Wilkes et al. vs. Ferris*, 5 Johns., 335; *Gibson vs. Stevens*, 20 How., 400. In the latter case, it is true, there was a delivery order written by the vendor on the back of the warehouse receipt, which, however, did not run to bearer. The court, while admitting that that did not amount to a formal assignment, yet held that it showed beyond doubt the intent to pass the title, " and that where that intent was evident from the language of the written instrument, and the nature and character of the contract, it was the duty of the court to carry it into execution without embarrassing it with needless formalities." That doctrine is as applicable to a case where there is the mere delivery of a receipt which itself runs to bearer, as it was there to the delivery of a receipt not running to bearer, with a delivery order indorsed on it by the vendor. The delivery alone in the one case as clearly indicates the intent, as the delivery and the indorsement in the other. The

case of *Horr et al. vs. Barker et al.*, 8 Cal., 603, also expressly decides that such a delivery would pass the title. I come then to the conclusion that, independently of this statute, a perfect title to the wheat would have passed by the several contracts of sale appearing in this case, and the delivery of the receipts though not indorsed. True, if Comstock purchased fraudulently, the sale was voidable as against him; but if he transferred to a *bona fide* purchaser without notice, such purchaser would hold the property.

And this being so, there seems, as already stated, nothing in the language or object of this statute that should defeat this result. On the contrary, the provisions of section 6 seem to have been designed to accomplish substantially the same purpose as the English Factor's Act, referred to in Abbott on Shipping, 542; 1 Smith's Leading Cases, 885. This object was, to protect those dealing with persons entrusted with the usual evidences of title, though in fact being mere agents with special authority. It grew out of inconveniences supposed to result from the rule of law that a factor authorized to sell could not pledge the property of his principal. The section under consideration provides that these receipts, &c., " may be transferred by indorsement thereof, and any person to whom the same may be so transferred shall be deemed and taken to be the owner of the goods, wares and merchandize therein specified, *so far as to give validity to any pledge, lien or transfer made or created by such person or persons.*" This language seems unmistakably to indicate that the legislature had in view the same evil that caused the English Factor's Act, and that they were not attempting to prescribe an inflexible mode for the transfer of such property by those who were the absolute owners. If a factor or agent should attempt to make an unauthorized disposition of the property of his principal by delivering the warehouse receipt, bill of lading or other evidence of title, without indorsement, then the purchaser's title would fail, because it could be only by aid of this statute that

he could sustain it; and that he could not do because he had not taken a transfer in the manner provided by statute.

But if the absolute owner of the property sells it, and delivers the receipt, the title will pass, because he could do that without the statute. And as the purchaser in such case is not obliged to ask any aid from the statute, he is not obliged to show such a transfer as the statute provided for.

For these reasons we think *Conkey* and *Cutler* acquired a good title to the wheat, and that the judgment against them must be reversed, with costs.