LANSDOWNE DISTILLERY, INC. *v.* DUGGAN'S
DISTILLERS PRODUCTS CORPORATION

[No. 113, October Term, 1948.]

*Decided March 10, 1949.*

*Rehearing denied April 26, 1949.*

542

. The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*George L. Clarke* and *Robert F. Skutch, Jr.*, with whom was *Leonard Weinberg* on the brief, for the appellant.

*Raphael Walter*, with whom were *Nyburg, Goldman & Walter* and *David S. Sykes* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

This case was instituted in the Court of Common Pleas by Duggan's Distillers Products Corporation, appellee (referred to as Duggan's) against the Lansdowne Distillery, Inc., appellant (referred to as Lansdowne) to recover $6156 paid by appellee to appellant on account of the purchase of 10,260 proof gallons of potato spirits for the sum of $14,671.80.

Lansdowne filed a counterclaim asserting its right to the balance of the purchase price. After appropriate pleadings, the case was tried before the court below, without the aid of a jury, and it dismissed the counterclaim of Lansdowne and found a verdict for Duggan's for $6156. Judgments being entered thereon, Lansdowne appealed.

Lansdowne is in the wholesale liquor business, with offices in Baltimore City. Duggan's is also in the whole-

sale liquor business, with offices in Elizabeth, New Jersey. The Commercial Solvents Corporation (herein called Solvents) operates a distillery at Terre Haute, Indiana. Lansdowne had Solvents distil for it a large quantity of potato spirits, which it held in bond for Lansdowne's account. This commodity was in short supply and Duggan's was in considerable need of it for use in its business. It discovered that Lansdowne had a supply of this article. It called Lansdowne on the telephone on the 16th day of July, 1946, and it agreed to buy, and Lansdowne agreed to sell to it 10,260 proof gallons of potato spirits at the price of $1.43 per proof gallon, in bond, including drums, *f. o. b.*, Solvents' registered distillery at Terre Haute, Indiana. Duggan was to pay 40 cents per gallon immediately and balance when the goods were received in Elizabeth, N. J. Duggan's desired the potato spirits transferred in bond from Solvents' distillery to Lehigh Warehouse & Transportation Co., Inc., Elizabeth, New Jersey (herein called Lehigh), a bonded warehouse. By holding the spirits in bond at the Lehigh warehouse, Duggan's deferred the payment of the Federal tax of $9 per gallon and could draw it out in such quantities as needed in its business, and pay the tax on the quantity withdrawn, and in this manner postpone the payment of the tax on the balance of the spirits it held in bond. In order to effectuate the transfer in bond of the spirits purchased, from Terre Haute, Indiana, to Elizabeth, New Jersey, it was necessary that Duggan's file United States Treasury Department form 236 with the government. On July 17, 1946, Duggan's wrote Lehigh: "* * * please prepare and forward Forms 236 for transfer to your warehouse in Elizabeth of approximately 10,300 gallons of spirits from Commercial Solvents Corp., Terre Haute, Indiana. This merchandise is presently in the cistern room but will be placed in drums."

There seems to be a good deal of detail regarding the filing of form 236. It has to be approved by government officials in the district in which Lehigh warehouse is situated, as well as approved by officials in the district in

which Solvents' distillery is situated. On July 17, 1946, Lansdowne notified Solvents by telephone to release 100 drums of spirits to Lehigh, for Duggan's on receipt of Lehigh's form 236, and confirmed conversation by letter of even date. Under the arrangement between Lansdowne and Solvents, when any of the spirits was sold Solvents procured a government gauger to draw it into drums, so that no costs to Duggan's was occasioned by this operation. On July 17, 1946, Lansdowne billed Duggan's for the full amount of the 10,260 gallons, and on July 22, 1946, Duggan's sent Lansdowne a check for $6156 on account. Duggan's was not sure that the price of the spirits included drums, and on July 18, 1946, wrote Lansdowne asking for written confirmation of the fact that the price included cooperage. On July 22, 1946, the same day Duggan's forwarded Lansdowne check for $6156, Solvents telephoned Lansdowne and advised it that Lehigh form 236 for Duggan's spirits had not been received, and this information was forwarded by Lansdowne to Duggan's by telegram of July 23, 1946, which stated: "COMMERCIAL SOLVENTS ADVISES TWO THIRTY SIXES ONE HUNDRED DRUMS NOT YET RECEIVED FROM LEHIGH WAREHOUSE." It appears that form 236 had been filed by Lehigh on Duggan's behalf on July 19, 1946, and it was not approved by the district supervisor of Solvents' warehouse district until July 24, 1946, and was not received at Solvents' office at Terre Haute until July 26, 1946. July 26, 1946, was on a Friday, and shipment of these spirits was not made by Solvents until their next regular shipping date, which was Monday, July 29, 1946. The shipment arrived at Elizabeth, New Jersey, on August 7, 1946, and was received for storage by the Lehigh warehouse for Duggan's account. The Lehigh warehouse issued a non-negotiable receipt for the spirits to Duggan's, which was accepted, and the freight bill in the amount of $309 was paid by Duggan's. Later an agent of Duggan's called Lansdowne and requested the return of the "deposit," to wit $6156. On August 23, 1946, Duggan's

wrote a letter to Lansdowne contending that the transaction was illegal, for at the time the spirits were shipped from Terre Haute the price on potato spirits was $1.03 per gallon, as fixed by government regulations. Lansdowne declined to return the amount paid on account, and this case was instituted.

The Emergency Price Control Act of 1942, 50 U. S. C. A. Appendix, § 901(a), expired on June 30, 1946. Government regulations were reimposed effective July 25, 1946. Between these dates there were no government price regulations.

It is the contention of Duggan's that title to the spirits did not pass prior to July 25, 1946, and, therefore, there was no delivery of the spirits by Lansdowne to it prior to that date; that the contract was an executory contract and was unexecuted on July 25, 1946, when government regulations were reimposed. It argues that the cistern in which the spirits was stored at Solvents' distillery contained a great number of gallons of which the amount it contracted for was a part; that though it was fungible goods it could not be delivered to it without first being drawn off into drums. But we do not think that the cases sustain this proposition.

In *Kimberly v. Patchin,* 19 N. Y. 330, at page 339, 75 Am. Dec. 334, it is said:

"But it is surely competent for the vendor to say in terms, that he waives that right, and that the purchaser shall become at once the legal owner of the number of gallons or bushels embraced in the sale. If he cannot say this effectually, then the reason must be that two men cannot be owners of separate quantities or proportions of an undistinguishable mass. That conclusion would be a naked absurdity, and I have shown that such is not the law."

In that case the purchaser bought wheat stored in mass and it was contended that as it was not separated from the mass at the time of the purchase it was not in a deliverable state and delivery could not be effected.

In *Brownfield v. Johnson*, 128 Pa. 254, 18 A. 543, 544, 6 L. R. A. 48, the defendant ordered 400 hectolitres of Brazil nuts. These Brazil nuts were shipped in mass, which was the usual method of shipping them, and the nuts were uniform in quality. The consignee refused delivery. The court said:

"The weight of American authority supports the proposition that, when property is sold to be taken out of a specific mass of uniform quality, title will pass at once upon the making of the contract, if such appears to be the intent, * * * In view of the necessities which grow out of such usage the American courts have departed from the rule adhered to in England, and have recognized a rule for the delivery of this class of property more in conformity with the commercial usages of the country. A distinction is made between those cases where the act of separation is burdensome and expensive, or involves selection, and those where the article is uniform in bulk, and the act of separation throws no additional burden on the buyer."

In *United States v. Amalgamated Sugar Co.*, 10 Cir., 72 F. 2d 755, at page 758, the court said:

"But it is contended that the contracts were executory and that title remained in the company on February 28, 1917, because the property had not been segregated and identified in separate form. Beet sugar of a standard and uniform grade, in bags of one hundred pounds each, is fungible property. In that respect it falls within the same class as flour, grain, or oil. Title to an unseparated part or unit of a larger quantity of fungible property passes under a valid contract of sale without separation, or segregation, if that is the intention of the parties."

In *Gourd v. Healy*, 206 N. Y. 423, 99 N. E. 1099, at page 1102, it is said:

"But this property was of a species in which there may be a transfer of title, even when it remains an integral part of a larger bulk. * * * 'Articles of this nature are sold, not by a description which refers to and distinguishes the particular thing, but in quantities, which

are ascertained by weight, measure, or count; the constituent parts which make up the mass being undistinguishable from each other by any physical difference in size, shape, texture, or quality.'"

That case involved the shipment of wine in bottles, stored in bulk.

In *Pleasants v. Pendleton,* 6 Rand. 473, 18 Am. Dec. 726, at page 729, it was said:

"To charge on a contract of sale, and put at the risk of the vendee, a constructive delivery is enough. An actual delivery, neither in law, nor in fact, is required. It is only necessary that it be such as to pass the entire right of property. A symbolical delivery, as the key of a warehouse where the goods are deposited, will pass them to the vendee: 1 Atk. 171; 1 East, 195; 3 Johns. 395. So, if the contract of sale be complete, though the goods continue in the warehouse where stored at the time of sale, under an agreement to be free of storage for a certain number of days, and during that time they be burnt, the vendee must bear the loss: *Phillimore v. Barry,* 1 Camp, 513. So where the vendor has no further act to do, to ascertain the quantity, quality, or price of the article sold, the vendee must bear every loss by fire, etc. Though he could not withdraw the goods from the place of deposit, because the duties were not paid, the fact that they were not paid being proclaimed at the sale, and vendor being in no default for the non-payment between the sale and burning: *Hinde v. Whitehouse,* 7 East, 558. But if by the terms of the sale there remains anything to be done by the vendor in order to render the goods deliverable, a loss subsequent to the sale, and prior to the doing of that act, must be borne by the vendor."

That case involved a shipment of flour, and it was also held:

"Where there is a usage that cooperage necessary on a delivery of flour to the vendee at a warehouse is to be done by the storer at the vendor's expense, it does not constitute a case where something remains to be done by

the vendor to complete the contract." See 26 L. R. A., N. S., 62.

The fact that the potato spirits were in a cistern where a great quantity was stored, and it was a part of that quantity, we think is immaterial. This contract was entered into on the 16th of July, 1946. It is not contended by appellee that there was anything wrong with the quality of the spirits; there was nothing to be done by Lansdowne in order to procure its transfer from Terre Haute, Indiana, to Elizabeth, New Jersey. Duggan's bought it *f. o. b.* Terre Haute. It wanted it shipped in bond to its bonded warehouse in Elizabeth, and in order to do so it had to comply with government regulations. On July 17, 1946, Lansdowne notified Solvents to hold the spirits for account of Duggan's; it notified Lansdowne that the government form 236 had not been received by it on the 23rd day of July, and Lansdowne immediately notified Duggan's of this fact. It is idle to say that Solvents had not been notified of this transaction, as contended by appellee. Duggan's had full knowledge of the government's regulation regarding the removal of potato spirits in bond from one government warehouse to another, and of the delay incident thereto. Under all the facts and circumstances of this case, we are of the opinion that it was the intention of these parties that title to the potato spirits passed when Solvents was notified of the transaction and directed by Lansdowne to hold for account of Duggan's 10,260 gallons of potato spirits. There was nothing else for Lansdowne to do, and dominion and control of the spirits at that time passed to Duggan's. At that time no government regulations regarding the price of potato spirits were in effect, and the sale was lawful.

"Slight evidence is, however, accepted as sufficient to show that title passes immediately on the sale, though the seller is to make a delivery." Citing *Benjamin on Sales*, sec. 325. *Cassinelli v. Humphrey Supply Co.*, 43 Nev. 208, 183 P. 523, at page 526. See *Johnson v. Be-*

*soyan,* 85 Cal. App. 2d 389, 193 P. 2d 63; *Woodbine v. Van Horn,* 29 Cal. 2d 95, 173 P. 2d 17.

It is further contended that title to the potato spirits did not pass to Duggan's, under the terms of the contract, until it was delivered on board cars at Terre Haute, Indiana, and as it was not delivered on board cars at Terre Haute until after July 25, 1946, and as government regulations were then in effect, the execution of the contract at that time was not lawful. The appellant contends that *f. o. b.,* as used in the contract, was never intended to effect title, but was used in connection with the price of the spirits sold.

It was said in *Craig Brokerage Co. v. Joseph A. Goddard Co.,* 92 Ind. App. 234, 175 N. E. 19, at page 23:

"The weight of authority supports the doctrine that a contract of sale, which in connection with the price employs the term *f. o. b.* at a given point, does not require the seller actually to deliver the goods at indicated point; but that expression qualifies only the price, and means that, wheresoever the goods may be shipped, the seller will either pay the freight to the indicated point, or, if the goods are not shipped there, it will deduct or permit the purchaser to deduct from the fixed price the amount of freight to the point indicated."

See *Lawder & Sons Co. v. Albert Mackie Grocery Co.,* 97 Md. 1, 54 A. 634, 62 L. R. A. 795; *Edgar & Son v. Imperial Ice Cream Co.,* 139 Md. 630, 116 A. 461; *International Co. c. Sun-Maid Raisin Growers,* 146 Md. 608, 127 A. 393.

We think that the term *f. o. b.* was not used with reference to delivery but with reference to price of the goods sold. In *International Co. v. Sun-Maid Raisin Growers. supra,* this court dealt with the general rule of law upon a sale *f. o. b.* It was there laid down that the intention of the parties always governs as to the place where title to goods pass. It discussed certain sections of Article 83 of the Code, the Uniform Sales Act. The Uniform Sales Act applies in order to determine the place of delivery when the contract, by its terms, does not state clearly

where the goods are to be delivered. But where the intention of the parties, as expressed in their contract, is clear and unambiguous as to the place of delivery, then such intention governs, and it is not necessary to resort to the application of the rules set out in the Uniform Sales Act.

We are of opinion that it was not the intent of the parties to this contract that title to the potato spirits should not pass until it was loaded on cars at Terre Haute. Title passed when the parties by their contract intended it to pass. From the facts and circumstances of this case, it was the intention of Duggan's to buy and Lansdowne to sell a certain quantity of specific potato spirits located in a cistern in Solvents' distillery at Terre Haute, Indiana; that Duggan's knew that it was in bond; but, nevertheless, it bought it and immediately gave orders to Lehigh to transfer it from Solvents' bonded distillery to Lehigh's bonded warehouse at Elizabeth, New Jersey, and that it paid $6156.00 on account thereof on July 22, 1946. Solvents was notified and held the goods for account of Duggan's. There is no doubt that prior to July 25, 1946, Duggan's had dominion and control over, and title to the same.

The judgments below will be reversed, and judgment will be entered for Lansdowne. In the counterclaim of Lansdowne against Duggan's, judgment will be entered for Lansdowne for $8515.80, with interest from August 7, 1946, and costs.

> *Judgment reversed in original suit with costs; judgment reversed in the cross suit and judgment for the plaintiff in the cross suit for $8515.80 with interest from August 7, 1946, with costs.*